<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RYAN PAGE, SR., f/k/a RYAN ROSE, et al., | |
| Plaintiffs, | CIVIL NO. 04-874 (SRC) |
| v. | **OPINION** |
| THE CITY OF TRENTON, et al. | |
| Defendants. | |

<u>**CHESLER, District Judge**</u>

    **THIS MATTER** comes before the Court on a series of Motions for Summary Judgment filed by the various defendants in this case: Motion for Summary Judgment by Defendant Douglas H. Palmer (docket entry # 32), Motion for Summary Judgment by Defendants William Raney and Ernie Parrey, Jr. (docket entry #35), Motion for Summary Judgment by Defendant Joseph Santiago (docket entry #38), Motion for Summary Judgment by Defendant Mark Miller (docket entry #44), and Motion for Summary Judgment by Defendant City of Trenton (docket entry #41). The Court, having considered the papers submitted by the parties, for the reasons set forth below, and for good cause shown, **GRANTS** Defendants' Motions, granting Summary Judgment in favor of the Defendants on Counts One and Two of the Plaintiffs' Complaint and dismissing the remainder of the case on the grounds that, absent the federal claims in Counts One

1

and Two, this Court lacks subject matter jurisdiction to adjudicate the remaining state claims in the Plaintiffs' Complaint.

## I.   BACKGROUND OF THE CASE

The Trenton Police Department ("TPD") was conducting an ongoing investigation of a series of five rapes that had been committed within the city of Trenton, New Jersey between September 2002 and May 2003.  These rapes seemed to follow a common pattern, and each of the victims described a similar assailant.  The assailant was deemed "the Bus Stop Rapist" by the TPD, and a special task force was formed to investigate and apprehend the perpetrator of these crimes.  (Kuhn Cert., Ex. 2 at 2.)  In each of these incidents, a female victim was walking alone late in the evening and approached by an individual who drove up to them and asked if they wanted a ride.  (Id., Ex. 1 at 1.)  Once inside the vehicle, the victims were asked by the driver to perform a sexual act in exchange for the ride.  (Id.)  When they refused and attempted to leave, the driver used physical force or threats of violence to sexually assault them.  (Id.)  The suspect in each of these rapes was described by the victims as a heavyset African-American male, 30 - 40 years old, with a dark complexion, between 5'6" and 6'0", with black, low cut hair, and driving a burgundy colored car. (See Kuhn Cert., Ex. B at 1 (Trenton Police Report, case number 093-02031477 detailing assault on April 3, 2002);  id., Ex. C. at 1 (Trenton Police Report, case number 271-02104463 detailing assault on September 9, 2002); id., Ex. D at 1 (Trenton Police Report, case number 109-03037720 detailing assault on April 19, 2003); id., Ex. E at 1 (Trenton Police Report, case number 123-03043677 detailing assault on May 3, 2003);  id., Ex. F at 1 (Trenton Police Report, case number 133-03048383 detailing assault on May 13, 2003)).

2

On May 13, 2003, Mark Miller, a TPD detective assigned to investigate these rapes, received a call from a TPD patrol officer that an individual matching the physical description of "the Bus Stop Rapist" was spotted entering the Pear Tavern, an establishment located in the area where two of the victims said they had seen their assailant "in and around on prior occasions." (Korin Cert., Ex. A at 14.)  This individual is identified only as "McK" to protect his identity. When McK was approached by police and advised of the ongoing investigation, he agreed to speak to the detectives investigating the rapes.  (Korin Cert., Ex. A at 14.)  He was transported to TPD headquarters where he met with TPD Detectives Miller and Raney.  (Id.)

At this meeting, the detectives obtained information from McK, and questioned him about his possible involvement in these attacks.  (Id. at 14-15.)  McK emphatically denied any knowledge of or involvement in these attacks.  (Id.)  During the meeting, TPD detectives ran a criminal history check on McK, which turned up six felony convictions and a prior arrest for sexual assault.  (Id. at 15.)  With McK's consent, the detectives took a digital photograph of him, and transported him back to his home.  (Id.)

Later than day, Det. Miller assembled a photo array of eight photographs to show to the victims of these sexual assaults.  (See Kuhn Cert., Ex. D at 8; Korin Cert., Ex. A at 134-43.)  The photo array was constructed using the TPD's Picture Link system.  (Santiago St. at 4.)  This lineup included the digital photo of McK, as well as pictures of seven other individuals whose photos were stored in the Picture Link system.  (Id.)  These seven additional photos were selected by the system on the basis of similarity of facial features to McK's.  (Id.)  A photograph of

Plaintiff Ryan Page[1] was one of the seven photos selected and included in the photo lineup. (Korin Cert., Ex. A at 15.)

On May 14, 2003, police artists compiled a composite picture of the suspect based on the reports of the victims of the 2003 attacks, and this picture was released to the local media.  (See Kuhn Cert., Ex. 1 at 1.)  This picture was released by the TPD to elicit leads on these cases by leveraging "the additional eyes and ears of the public."  (Id.)  Along with the sketch, the TPD also released a brief description of the suspect as "[a] black male, approximately 35 years of age, heavy-set (approx. 280-300 lbs.), with a darker patch of skin on his right cheek.  He may have a mustache."  (Id.)  The press release accompanying the picture also included a description of the suspect's car as a "burgundy-colored, two-door Buick, with exterior door handles located on the upper door, and dark interior."  (Id.)

On May 15, 2003, the photo array prepared by Det. Miller was shown to the victims of four of these sexual assaults by TPD detectives.  The victims of the April 3, 2002, April 19, 2003, May 3, 2003, and May 13, 2003 assaults all independently identified the photograph of Plaintiff Ryan Rose as the person who assaulted them from the lineup of eight photographs.  (See Korin Cert., Ex. A at 28, 49, 74, & 114.)  Signed statements confirming the victims' identification of their attacker were also obtained from all four victims.  (See id.)  Detectives were not able to contact the fifth victim to obtain an identification at this time.  (Id. at 16.)

Based on these four identifications, Det. Raney prepared affidavits of probable cause and secured arrest warrants for Mr. Page on four of the five sexual assaults on May 15, 2003.  (See

---

[1] The Plaintiff, Ryan Page, also has two additional aliases, Ryan Rose and Ryan Ross. (Korin Cert., Ex. A at 16.)  For purposes of simplicity, this opinion will, at all times, consistently refer to the Plaintiff by the name Ryan Page.

id. at 1, 3, 33, 34, 51, 54, 103, & 104.)  TPD Detectives Raney and Parrey, along with other

detectives from the TPD, proceeded to Mr. Page's last known address to execute the arrest

warrants.  (Id.)  When they arrived at Mr. Page's last known address, they were told that he no

longer lived there, but were given another address where Mr. Page currently resided.  (Id. at 17.)

When looking for that address, they noticed a burgundy colored Buick Regal parked in an alley

by Mr. Page's new residence, which had door handles located on the door pillar.  (Id.)  This

further aroused the detectives' suspicions, since this matched the description of the suspects' car

provided by some of the rape victims (see Kuhn Cert., Ex. C at 1 (describing suspect's car as

burgundy colored, possibly a Cadillac); id., Ex. D at 3 (describing suspect's car as burgundy

Buick); id., Ex. F at 2 (describing suspect's car as burgundy with "door handles on the door pillar

next to the window")).

At this time, the TPD detectives saw Mr. Page standing on the front porch of his

residence.  (Korin Cert., Ex. A at 17)  When police approached him, Mr. Page stated that he was

leaving his house to come to the police station because his friends had told him that "his picture

was on the front page of *the Trentonian* newspaper" as the "guy who was raping those girls."

(Id.)  Mr. Page was taken into custody by the detectives, and brought to the police station.  (Id.)

Upon leaving Mr. Page's residence, Det. Raney learned that the Buick they saw parked in

the alley by Mr. Page's residence was registered to Ms. Benitz, a neighbor of Mr. Page.  (Id.)

TPD detectives subsequently met with Ms. Benitz at her home and learned that, while she

believed that no one uses the car, she and her husband go to bed early and do not hear what goes

on outside their home.  (Id.)  Because of the severity of the crime at issue, and the fact that Mr.

Page may have access to their car and be using it without Ms. Benitz's knowledge, the detectives

obtained Ms. Benitz's consent to have her car taken by the TPD ID unit to search it for possible evidence of the rapes.  (Id.)

Mr. Page was interviewed by TPD detectives, and denied any involvement in the sexual assaults.  (Id. at 19.)  Mr. Page was subsequently charged with four counts of sexual assault, as well as kidnapping, robbery, and weapons offenses related to the assaults.  (Id.)  Mr. Page was held in the Mercer County Detention unit pending arraignment, and a search warrant was obtained and executed for his home.  (Id.)  Following arraignment, Mr. Page continued to be held on four million dollars bail.  (Id., Ex. 3 at 1.)

After Mr. Page's arrest, a press conference was held on May 16, 2003.  At the press conference, Mr. Page was identified as the suspect in a string of four sexual assaults, and it was announced that "[p]olice had connected one other sex crime to the string, a September 2002 assault."  (Id.)  Defendant Joseph Santiago, Director of the TPD, was quoted as saying that four of the five women assaulted had identified Mr. Page as their attacker, and that the investigation was continuing.  (Id.)  Defendant Douglas Palmer, Mayor of Trenton, was quoted as congratulating the TPD for identifying and catching Mr. Page through "'fundamental' and 'relentless' police work."  (Id.)

A Buccal control warrant was issued on May 21, 2003, (Morelli Cert. at 188) and physical samples of Mr. Page's DNA were taken on May 27, 2003 for comparison to samples obtained from the crime scenes.  (Korin Cert., Ex. A at 19)  The fifth victim was also located and shown a photo array of eight pictures, including Mr. Page's, but was unable to make a positive identification of her attacker.  (Id.)  On May 29, 2003, the Buccal sample that was taken from Mr. Page was compared with the sexual examination kits taken from the five victims by the New

Jersey State Police Laboratory ("NJSPL"). (Kuhn Cert, Ex. 4 at 1.) The test eliminated Mr. Page as a suspect who sexually assaulted the four victims. (Id.) The TPD subsequently released a press release announcing that DNA test results "proved negative" in matching Mr. Page with evidence collected in the string of assaults he had been charged with. (Id.) The release also noted that DNA evidence collected in each of the four incidents confirmed that all four attacks were committed by the same suspect.[2] (Id.) Mr. Page was released from custody that same day. (Kuhn Cert., Ex. 4.)

While police were pursuing their case against Mr. Page, other information continued to come in as leads in these cases generated by the release of the composite picture to the media yielded additional tips. On May 16, 2003, Det. Miller received a tip from the Trenton Crime Stoppers that they had been contacted by a person who identified an individual resembling the person in the composite picture, who owned a two door Buick Regal with door handles on the door pillars. (Kuhn Cert., Ex. B at 18.) Subsequent follow-up on this tip led police to Paul Burke, who was arrested on June 11, 2003 and charged with the assaults. (Korin Cert., Ex. A at 69.) Subsequent testing of Mr. Burke's DNA positively linked him to the four assaults Mr. Page had previously been charged with. (Id.)

On February 24, 2004, Mr. Page and his wife Terricka Page filed an eight count complaint against various defendants, including: the City of Trenton, Douglas Palmer (the Mayor of Trenton), Joseph Santiago (Police Director of Trenton), and TPD detectives William Raney and Ernie Parrey. In their complaint, the Plaintiffs allege that Mr. Page's arrest and detention deprived him of his federal civil rights under 42 U.S.C. § 1983 (Count 1), and that the

---

[2] There was no DNA evidence collected in one of the five cases. (Kuhn Cert., Ex. 4 at 1.)

Defendants conspired to deprive Mr. Page of his federal civil rights under 42 U.S.C. § 1985

(Count 2).  The Complaint also includes numerous state and common law causes of action

including false arrest and imprisonment (Count 3), malicious prosecution (Count 4), negligent

hiring and retention of the detectives involved in Mr. Page's arrest (Count 5), defamation (Count

6), intentional infliction of emotional distress (Count 7), and loss of consortium to Mrs. Page

(Count 8).  Prior motion practice in this case has dismissed Counts 1, 2, 3, 4, 5, and 7 against

Defendant Santiago (see docket #45), dismissed Counts 1, 2, 3, 4, and 7 against Defendant

Palmer (see docket #47), and dismissed Count 5 against Defendant City of Trenton (see docket

#59).


## II.  SUMMARY JUDGMENT STANDARD

A party seeking summary judgment must "show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Orson, Inc. v. Miramax

Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996).  In deciding whether there is a disputed issue of

material fact, the Court must view the underlying facts and draw all reasonable inferences in

favor of the non-moving party.   Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475

U.S. 574, 587 (1986); Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The

threshold inquiry is whether there are "any genuine factual issues that properly can be resolved

only by a finder of fact because they may reasonably be resolved in favor of either party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

Once the moving party has properly supported its showing of no triable issue of fact and

of an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita, 475 U.S. at 586; see also Anderson, 477 U.S. at 247-48. The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) ("to raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather "must exceed the 'mere scintilla' threshold"), cert. denied, 507 U.S. 912 (1993). Consistent with this standard, the Court will review each of the Defendant's arguments in turn.

### III.  DISCUSSION

The Plaintiffs' federal claims in this case are based on Title 42 U.S.C. §§ 1983 and 1985. Section 1983 provides civil remedies against any person who, under color of state law, deprives another of rights protected by the United States Constitution. See Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992). Section 1983 does not, by itself, confer any substantive rights, but rather serves as a vehicle to enforce rights granted under the Constitution or federal law. Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). Accordingly, to state a claim under § 1983, a plaintiff must "prove a violation of the underlying constitutional right." Daniels v. Williams, 474 U.S. 327, 330 (1986). The Plaintiffs' § 1985 claims allege that the Defendants conspired to deprive Mr. Page of his rights protected by the Constitution. Such claims also require a showing that an underlying constitutional right has been violated to support the

9

allegations of a conspiracy.  See Great American Federal Savings and Loan Ass'n v. Novotny, 442 U.S. 366, 372 (1979).

The Plaintiffs are alleging that Mr. Page was subjected to false arrest, false imprisonment, unwarranted and malicious criminal prosecution, cruel and unusual punishment, and deprived of equal protection under the law - in violation of 42 U.S.C. §§ 1983 and 1985, and the Fourth, Fifth, Eighth, and Fourteenth Amendments.  (Compl. at 11, ¶ 49.)  In addition to imposing liability on the individuals directly involved in this incident, Plaintiffs also seek to impose §§ 1983 and 1985 liability on the City of Trenton for instituting "customs, policies, practices, procedures, and rules" which were the "moving force and direct and proximate cause of the Constitutional violations suffered by Mr. Page" as well as supervisory liability on certain defendants for "acquiescing in a pattern of unconstitutional conduct by police officers" that violated Mr. Page's constitutionally protected rights.  (Compl. at 9-10, ¶¶ 39 - 44.)

A.      **The Defendants Did Not Use Unconstitutionally Excessive Force in Arresting Mr. Page.**

The Plaintiffs claim that Mr. Page's arrest and subsequent detention was a violation of his right to be free from cruel and unusual punishment as protected by the Eighth Amendment.  The Eighth Amendment, however, is wholly inapplicable to the case at issue.  As the Third Circuit has noted, "[t]he Eighth Amendment applies only after the state 'has secured a formal adjudication of guilt' because prior to that time it has not acquired 'the power to punish with which the Eighth Amendment is concerned.'" Sylvester v. City of Newark, 120 Fed.Appx. 419, 423 (3d Cir. 2005) (quoting Ingraham v. Wright, 430 U.S. 651, 671-72 n.40 (1977)).  Since Mr.

Page was never tried and convicted of, or pled guilty to, any of the crimes he was charged with, the Eighth Amendment does not apply here.

While the Plaintiffs' claims cannot be sustained under the Eighth Amendment, it is important to identify the specific constitutional right allegedly being violated to determine the appropriate constitutional standard to apply. See Graham v. Connor, 490 U.S. 386, 394 (1989) ( "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."). The Complaint does not specify what, if any, specific behavior of the police in relation to Mr. Page's arrest and detention is the basis of the alleged Eighth Amendment violation. The Complaint only provides a narrative description of Mr. Page's arrest, noting that the police "surrounded Mr. Page's home with guns drawn," "violently intruded upon Mr. Page's porch," "tightly handcuffed Mr. Page, then forced him into the back of a police car" while subjecting him to "degrading and defaming verbal harassment." (Compl. at 5, ¶¶ 18-20.)

Presuming that the Plaintiffs' Eighth Amendment claim is based upon an allegation that the force used in the arrest of Mr. Page was unconstitutionally excessive under § 1983, the Plaintiffs should have pleaded this as an alleged violation of Mr. Page's Fourth Amendment rights.[3] Graham v. Connor, 490 U.S. 386, 394 (1989) (noting excessive force claims "in the

_____

[3] In this case, based on the allegations contained in the Complaint, it appears that the source of the Eighth Amendment claim is the force used by police in effectuating Mr. Page's arrest. This claim would be properly analyzed under the Fourth Amendment's 'reasonableness' standard. Graham v. Connor, 490 U.S. 386, 394 (1989) (noting that "all claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard"). If the source of the Plaintiffs' Eighth Amendment claim was the treatment Mr. Page received while in custody of the TPD, however, the claim should have been pleaded as a violation of the Due Process Clause of the Fourteenth

course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed

under the Fourth Amendment and its 'reasonableness' standard").  To sustain such a claim,

however, would require the Plaintiffs to demonstrate that the force used by police in Mr. Page's

arrest was not "objectively reasonable." Mellott v. Heemer, 161 F.3d 117, 122 (3d Cir. 1998)

(quoting Graham, 490 U.S. at 397).  To determine whether or not the force used was 'reasonable'

requires the Court to look at the facts and circumstances of each case, including the severity of

the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or

others, and whether the suspect was actively resisting arrest or attempting to flee.  Id. at 122

(citing Graham, 490 U.S. at 396).  The Third Circuit has also noted that another important

consideration in these inquiries is whether "the physical force applied was of such an extent as to

lead to injury." Id. (quoting Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997)).

    While it is undisputed that Mr. Page made no effort to resist his arrest by the TPD, it is

also undisputed that he was being charged with a series of violent crimes, some of which were

carried out with the aid of a deadly weapon.  To approach such a suspect with guns drawn and to

insist on tightly handcuffing them upon arrest appears, to this Court, to be objectively reasonable

when viewed in light of the totality of the circumstances presented to the police at the time of Mr.

---

Amendment, rather than the Eighth Amendment. Sylvester v. City of Newark, 120 Fed.Appx.
419, 423 (3d Cir. 2005).  Under these circumstances, the Court would, nonetheless, analyze the
Plaintiffs' claim under the standards established for an Eighth Amendment violation.  Id. (noting
that "the Supreme Court has concluded that the Fourteenth Amendment affords pretrial detainees
protections 'at least as great as the Eighth Amendment protection available to a convicted
prisoner,' without deciding whether the Fourteenth Amendment provides greater protections").
Given Mr. Page's blanket admission that he "was never abused or hurt by any of the cops"
(Korin Cert., Ex. C, at 2 (page 76, lines 3-5 of Mr. Page's deposition), a claim of cruel and
unusual punishment regarding his incarceration, however, would similarly fail to survive
summary judgment as an alleged violation of the Fourteenth Amendment either.

Page's arrest.  The only physical injury claimed by Mr. Page was that he "was just bruised" by the tightness of the handcuffs, but there were "little damages."  (Korin Cert., Ex. C, at 2 (page 73, lines 18-22.)  Furthermore, Mr. Page readily admitted "for the record" that he "was never abused or hurt by any of the cops."  (Korin Cert., Ex. C, at 2 (page 76, lines 3-5 of Mr. Page's deposition).)  Accordingly, summary judgment in favor of the Defendants is appropriate with regards to Mr. Page's excessive force claims under § 1983.

**B.      Summary Judgment is Appropriate for the Plaintiffs' Remaining § 1983 Claims Because the Police Had Sufficient Probable Cause to Arrest Mr. Page**.

The determinative question for the Plaintiffs' remaining federal claims is whether or not the TPD acted with probable cause in arresting Mr. Page.  If this Court finds that Mr. Page's arrest was done with sufficient probable cause, then the Defendants are entitled to summary judgment on the Plaintiffs' claims of false arrest.  Dowling v. City of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988) (noting probable cause is the "threshold issue" on summary judgment determination for § 1983 claim based on false arrest).  If Mr. Page's arrest was supported by probable cause, the remainder of the Plaintiffs' federal claims fail as well.  The U.S. Supreme Court has made it clear that an arrest based upon probable cause cannot become the source of a constitutional claim for false imprisonment.  Baker v. McCollan, 443 U.S. 137, 143-44 (1979).  Similarly, the Plaintiffs cannot maintain their constitutional claims for malicious prosecution if it is shown that the criminal proceedings against Mr. Page were initiated based on probable cause.  See Montgomery v. DeSimone, 159 F.3d 120, 124 (3d Cir. 1998) (in order to prevail on malicious prosecution claim under § 1983, a plaintiff must establish, among other things, the

13

absence of probable cause for the initiation of proceedings); <u>Luthe v. City of Cape May</u>, 49 F.Supp.2d 380, 393 (D.N.J. 1999) (if probable cause exists for initiating criminal prosecution, claims for malicious prosecution on that charge must fail).

While the existence of probable cause is often a question for the jury, where the Defendants' asserted probable cause is such that no reasonable jury could find that the police lacked probable cause, summary judgment is appropriate.  <u>Sharrar v. Felsing</u>, 128 F.3d 810, 818 (3d Cir. 1997) ("[The] question [of probable cause to support an arrest in a § 1983 action] is for the jury only if there is sufficient evidence whereby a jury could reasonably find that the police officers did not have probable cause to arrest.");  <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 634-35 (3d Cir. 1995) (noting "Summary Judgment can be granted in an appropriate case on probable cause") (citing <u>Deary v. Three Un-Named Police Officers</u>, 746 F.2d 185, 191 (3d Cir. 1984).  This Court finds that this is such a case where summary judgment is appropriate on the issue of whether or not the police had probable cause to justify their actions.

*1.*      ***The Plaintiffs' Claims for False Arrest, Imprisonment, and Malicious Prosecution are Without Merit Since the Police Had Adequate Probable Cause to Justify Mr. Page's Arrest and Detention***

The Plaintiffs note that, despite Mr. Page's arrest and detainment on these rape charges, he was "completely and totally innocent."  (Compl. at 2, ¶ 2.)  "The proper inquiry in a [S]ection 1983 claim based on false arrest[, however,] . . . is not whether the person arrested in fact committed the offense but whether the arresting officers had *probable cause* to believe the person arrested had committed the offense." <u>Dowling</u>, 855 F.2d 141 (emphasis added).  Probable

14

cause exists where "the facts and circumstances within [an officer's] knowledge and of which [that officer] had reasonably trustworthy information [are] sufficient as of themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Edwards v. City of Philadelphia, 860 F.2d 568, 571 (3d Cir. 1988) (citing Brinegar v. United States, 338 U.S. 160, 175-76 (1949)).

The Plaintiffs allege that Mr. Page's arrest was made without "any conceivable justification" and with an "utter lack of any probable cause that might even remotely justify Mr. Page's arrest and treatment."  (Compl. at 6, ¶¶ 24-25.)  The Plaintiffs further allege that Mr. Page "bore no resemblance to the suspected rapist - other than he was an African-American male." (Compl. at 6, ¶ 24.)  An evaluation of the evidence presented to this Court, however, provides no support for the Plaintiffs' assertions.

Mr. Page was independently picked out of a photographic lineup comprised of eight photographs of African-American males with similar facial features by all four victims who were contacted by the TPD prior to Mr. Page's arrest.  None of the victims identified a photo of one of the other African-American males in the lineup as their attacker, and none of the victims failed to identify Mr. Page as their assailant.  Four independent identifications by the individual victims – all of whom unanimously picked out Mr. Page as their attacker – creates a strong underlying probable cause behind the warrants issued for Mr. Page's arrest.  See Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1997) ("[w]hen a police officer has received a reliable identification by a victim of his or her attacker, the police have probable cause").

The identifications by all four victims were, furthermore, clear and unequivocal.  The victim of the April 3, 2002 attack "immediately shouted '[t]hat's the . . . bastard who raped me"

15

upon being handed Mr. Page's picture as the eighth and final photograph in the lineup.  (Kuhn Cert., Ex. B at 15.)  The victim of the April 19, 2003 attack, in her signed statement to police, identified Mr. Page from the photo lineup, asserting that she was "absolutely positive" Mr. Page was the man who assaulted her.  (Kuhn Cert., Ex. D at 25.)  The victims of the May 3 and 13, 2003 attacks, also in written statements to police, both affirmatively recognized Mr. Page's photo from the lineup of eight persons as their rapist.  (Korin Cert., Ex. A at 29 & 114.)  There is no evidence presented by the Plaintiffs that these witnesses should have been considered unreliable, nor is there any indication of exculpating evidence available to police at the time of Mr. Page's arrest to mitigate the strong probable cause created by these four independent eyewitness identifications of Mr. Page as the alleged attacker.

> **a.**      **There is no support for the Plaintiff's claims that the victim identifications relied on by the police were the product of undue police coercion.**

The Plaintiffs allege that these four independent identifications of Mr. Page as the suspected rapist were invalid because they were the product of undue police coercion.  In their Complaint, the Plaintiffs claim that "several of the victims were threatened with outstanding warrants of arrest if they did not 'recall' Mr. Page as their assailant."  (Compl. at 2 ¶ 2.)  This claim, however, is not supported by any independent evidence offered by the Plaintiff other than the mere allegation that such improper coercion took place.

Of the four witnesses who identified Mr. Page as their assailant, the Plaintiffs have not presented any evidence to support a claim that they were in any way threatened or otherwise coerced by police to improperly identify Mr. Page.  It is worth noting, however, that the

Defendants have presented statements by two of the four witnesses that Mr. Page subsequently attempted to bribe them to offer false testimony that their identifications were improperly coerced by police.  (See Kuhn Cert., Ex. 8 at 2 (statement by victim C.F.[4] that Mr. Page approached her in December 2003 and offered to "buy her a new car and baby clothes if she testified at his civil trial that the police told her to falsely identify him as the sexual assault suspect"); id. at 4 (statement by victim C.J. that Mr. Page approached her in August 2004 and offered her a cash bribe in exchange for testimony against the police at Mr. Page's civil trial).)  In both cases, the victims re-affirmed that there was *no* improper coercion by police which influenced their identification of Mr. Page as their assailant.  (Id. at 2 (statement by C.F. confirming  "there was no police influence in her selection of [Mr. Page]"); id. at 4 (statement by C.J. that "she identified [Mr. Page] as the suspect who sexually assaulted her of her own free will").)

The only scintilla of evidence offered by Plaintiffs to support their allegation of police misconduct in the identification of Mr. Page as the rape suspect was offered by victim C.W. in an interview held with police on August 31, 2004.  (Id.)  During this interview, C.W. claimed. that she was shown the photo array and told to sign all the photos but, inexplicably, she signed only one - the photo of Mr. Page.  (Id. at 4.)  While C.W. acknowledged that, in her written and signed statement she gave to police on May 15, 2003, she identified Mr. Page as the one who assaulted her, she claimed that *sometime after* Mr. Page had been arrested, she contacted Det. Miller to tell him that she signed the wrong picture.  (Id. at 5.)

---

[4] The victims' names, where identified, have been truncated in this opinion to protect their privacy.

"It is the function of the court to determine whether the objective facts available to the officers *at the time of the arrest* were sufficient to justify a reasonable belief that an offense [had been] committed." United States v. Glasser, 750 F.2d 1197, 1206 (3d Cir. 1984) (emphasis added). Even if this victim later recanted her identification of Mr. Page, this does not provide support to undermine the probable cause created by her signed statement to police on May 15, 2003 where she positively identified Mr. Page as her assailant. The possible recanting of this identification at some time *after* his arrest by police does not offer any evidence to refute the Defendants' overwhelming evidence that, at the time of Mr. Page's arrest, the police had adequate probable cause to procure and execute warrants to arrest Mr. Page.

   **b.   The Plaintiffs' challenges to the validity of the arrest warrants issued for Mr. Page's arrest do not set out a Fourth Amendment violation as required to sustain their § 1983 claims.**

The Plaintiffs further contest the validity of Mr. Page's arrest on the grounds that three of the four warrants issued for Mr. Page's arrest were invalid. Even if the Plaintiffs were to demonstrate that three of the four warrants issued for Mr. Page's arrest were somehow invalid under the Fourth Amendment, the Plaintiffs' arguments still leave police in possession of a duly executed warrant for Mr. Page's arrest whose validity remains uncontested. Based on the existence of this warrant alone, the police were authorized under the Fourth Amendment to conduct the ensuing arrest of Mr. Page on the front porch of his residence. See Payton v. New York, 445 U.S. 573, 602 (1980) ("[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the

suspect lives when there is reason to believe the suspect is within.")  Such a seizure, when based on a valid arrest warrant, does not present a violation of Mr. Page's rights under the Fourth Amendment or §1983, irregardless of the validity of any additional warrants for Mr. Page's arrest held by the police at the time.

Furthermore, the Plaintiffs' challenges to the validity of the three contested warrants does nothing to undermine the existence of probable cause which nullifies the Plaintiffs' remaining Fourth Amendment claims for false imprisonment and malicious prosecution.  The Plaintiffs challenge the validity of one of the warrants on the grounds that the photo lineup used to identify Mr. Page, and provide the probable cause to support this particular warrant, was "suspect" because it was conducted by the investigating officer, Det. Miller.  (Miller Opp. Br. at 14.)  As the Plaintiffs note, the New Jersey Attorney General's guidelines for preparing and conducting photo lineups recommend that, wherever possible, an officer "other than the primary investigator in the case" should conduct photo lineups.  (Kuhn Cert., Ex. 9 at 1.)  The Plaintiffs argue that, because Det. Miller was the primary investigator in this case, his personally conducting the photo lineup rendered the victim's identification of Mr. Page invalid.  This, therefore, made Mr. Page's subsequent arrest without probable cause and in violation of § 1983.

This argument, however, is what the Third Circuit aptly describes as an improper attempt "to inject a due process argument into what is primarily a fourth amendment claim."  Wilson v. Russo, 212 F.3d 781, 789 fn5 (3d Cir. 2000).[5]  The relevant question for this Court is *not*

_____

[5] The constitutionality of arrests by state officials is governed by the Fourth Amendment rather than due process analysis. See County of Sacramento v. Lewis, 523 U.S. 833, 842-43 (1998); United States v. Lanier, 520 U.S. 259, 272 n. 7 (1997); Graham v. Connor, 490 U.S. 386, 394 (1989).  This Court's analysis of Mr. Page's arrest is therefore appropriately limited to whether it violated his Fourth Amendment rights - not whether it violated constitutional Due

whether the information obtained by police officers was obtained in strict adherence to the Attorney General's "best practice" guidelines (Kuhn Cert., Ex. 9 at 1.). The appropriate inquiry is whether this "information would warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995). While Det. Miller personally conducting a photo lineup for this particular victim may have been less-than-optimal police investigatory procedure, there is no evidence offered or alleged that this resulted in the victim being improperly influenced in her identification of Mr. Page as her attacker. On the contrary, in subsequent statements submitted by the Defendants, the witness whose identification was allegedly impaired by Det. Miller's conduct of the photo lineup affirmed that, despite Det. Miller conducting the photo lineup, "there was no police influence in her selection of [Mr. Page]." (Kuhn Cert., Ex. 8 at 2.) This identification, therefore, provided sufficient information to warrant a reasonable person to believe that Mr. Page had committed the crime with which he was being arrested for and was not a constitutional violation or a violation of § 1983. See Orsatti, 71 F.3d at 484.

The Plaintiffs further challenge the validity of the two remaining warrants issued for Mr. Page's arrest on the grounds that they were facially defective because they lacked an underlying statement of the basis for probable cause. The affidavits accompanying the arrest warrants for the April 3, 2002 and the May 3, 2003 attacks each contained a sworn statement by Det. Miller that the victim gave a formal statement and positive identification of Mr. Page as their attacker. (See Korin Cert., Ex. A at 54 (affidavit of probable cause accompanying warrant for April 3,

---

Process. See Baker v. McCollan, 443 U.S. 137, 142-43 (1979) (interpreting § 1983 false imprisonment claim as grounded in Fourth Amendment rights).

2003 attack); <u>id.</u> at 104 (affidavit of probable cause accompanying warrant for May 3, 2003

attack).)  The warrants for the May 13, 2003 and April 19, 2003 attacks, however, do not have a

similar statement in their accompanying affidavits, but merely recount the events of the crime.

(<u>Id.</u> at 3 (affidavit of probable cause accompanying warrant for May 13, 2003 attack); <u>id.</u> at 34

(affidavit of probable cause accompanying warrant for April 19, 2003 attack).)

Again, this argument fails to undermine the fact that, at the time of Mr. Page's arrest, the

police had sufficient probable cause to detain and initiate a criminal prosecution against Mr. Page

as required by the Fourth Amendment and § 1983.  As noted above, even if two of the four

warrants possessed by the police at the time of Mr. Page's arrest were facially invalid, the two

remaining, and facially valid, warrants were sufficient to justify Mr. Page's arrest without a

violation of his Fourth Amendment rights.  Nonwithstanding the missing information on two of

the warrant affidavits, it is not disputed that police had, at the time of Mr. Page's arrest, written

and signed statements from all four victims that positively identified Mr. Page as their attacker.

(<u>See</u> Korin Aff., Ex. A at 28; <u>id.</u> at 49.)  This is sufficient probable cause to constitutionally

justify Mr. Page's arrest, detention, and the initiation of criminal proceedings against him under

the Fourth Amendment.  The omission of this information from the affidavits used to obtain

these two warrants does not, therefore, constitute a violation of Mr. Page's constitutional rights

under the Fourth Amendment or a violation of § 1983.


**C.    Without an Underlying Constitutional Violation, There is no Basis for Supervisory or Municipal Liability Under § 1983.**

Because this Court finds that there is no evidence that the police officers violated Mr.

Page's constitutional rights, there is no basis for municipal or supervisory liability under § 1983 either.  The Defendants, therefore, are entitled to summary judgment on these claims as well.  See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (where there is no underlying constitutional tort by individual police officers, there can be no liability of the municipality or its supervisory officials for their actions either).

**D.      The Plaintiffs' § 1985 Claims are Dismissed Because Plaintiffs Failed to Demonstrate any Constitutional Violation**

The Plaintiffs also bring claims under 42 U.S.C. § 1985 that the Defendants "conspired with and among each other to deprive Mr. Page of his Constitutional rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution."  (Compl. at 13, ¶ 56.)  Like § 1983, § 1985 provides no substantial rights itself, but merely "provides a remedy for violation of the rights it designates."   Great American Federal Savings and Loan Ass'n v. Novotny, 442 U.S. 366, 372 (1979).  The success of the Plaintiffs' § 1985 claims, like their underlying § 1983 claims, requires a showing that Mr. Page was deprived of a federally protected right.  See, e.g., Moire v. Temple Univ. Sch. of Medicine, 613 F.Supp. 1360, 1366 (D.C.P.A. 1985) (noting "success of plaintiff's § 1985(3) claim must be dependent upon success of her underlying § 1983 claim").  Since, as noted above, the Plaintiffs have failed to demonstrate a deprivation of Mr. Page's constitutional rights, their conspiracy claim under § 1985 cannot be sustained.  Accordingly, summary judgment is granted to the Defendants on Count Two of the Plaintiffs' Complaint as well.

**E.    The Plaintiffs' Remaining State Law Claims are Dismissed for Lack of Subject Matter Jurisdiction**

In addition to the federal constitutional claims addressed above, the Plaintiffs also bring state law claims for false arrest and imprisonment, malicious prosecution, negligence, defamation, intentional infliction of emotional distress, and loss of consortium against the Defendants. Because the Court has granted summary judgment in favor of the Defendants on all of the Plaintiffs' federal claims, it declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims. See United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); Broderick v. Associated Hosp. Serv., 536 F.2d 1, 8 n. 25 (3d Cir.1976); Caputo v. Fauver, 800 F.Supp. 168, 172 (D.N.J.1992), aff'd, 995 F.2d 216 (3d Cir.1993).  Accordingly, these remaining claims are dismissed for lack of subject matter jurisdiction.

## IV.   CONCLUSION

For the reasons stated above, and for good cause shown, the Court grants the Defendants' Motions for Summary Judgment on Counts One and Two of the Plaintiffs' Complaint and dismisses the remaining Counts of the Plaintiffs' Complaint for lack of subject matter jurisdiction.  An appropriate form of order will be filed herewith.

Date:   December 29, 2005

           s/Stanley R. Chesler
Stanley R. Chesler, U.S.D.J.